## METROPOLITAN EDISON CO. v. FEDERAL POWER COMMISSION.

### No. 9585.

Circuit Court of Appeals
Third Circuit.

Argued June 22, 1948.

Decided Aug. 23, 1948.

---

Harold J. Ryan, of Reading, Pa. (James B. Liberman, of New York City, on the brief), for petitioner.

George T. Hambright, of Lancaster, Pa. (John C. Kelley, Geo. Ross Hull, and Hull, Leiby and Metzger, all of Harrisburg, Pa., on the brief), for Pennsylvania Water & Power Commission, amicus curiae.

Willard W. Gatchell, of Washington, D. C. (Bradford Ross, Joseph B. Hobbs, Reuben Goldberg, and Francis L. Hall, all of Washington, D. C., on the brief), for respondent.

Before BIGGS, McLAUGHLIN, and O'CONNELL, Circuit Judges.

BIGGS, Circuit Judge.

The petitioner, Metropolitan Edison Company, seeks review of an order of the respondent, Federal Power Commission, filed November 7, 1944, as amended November 17, 1947, authorizing the issuance of a major license to Metropolitan for the operation by it of the constructed hydroelectric project known as the "York Haven Project", located on the Susquehanna River, a navigable water of the United States at York Haven, Pennsylvania.[1] The York

---

[1] The Commission on March 12, 1940 served on Metropolitan a rule to show cause why Metropolitan should not apply for and secure from the Commission a license with respect to the York Haven Project situated in and on the right bank of the Susquehanna River at or near the Borough of York Haven, Pennsylvania, or in the alternative, cease and desist in the operation and maintenance thereof or, as a further alternative, why the Commission should not request the Attorney General to institute appropriate proceedings against Metropolitan with respect thereto. The show cause order averred that the Susquehanna River is a navigable stream of the United States and that the York Haven Project was not

Haven Project was constructed originally about 1901 by a company subsequently merged into Metropolitan. Metropolitan objects to the Commission's order of November 7, 1944, as amended, in two major particulars. It asserts that the provisions of Paragraph (A) (viii) [2] are not in conformity with the Federal Power Act, 16 U.S.C.A. § 791a et seq., and that the provisions of Paragraph (B),[3] dealing with rate of return and amortization reserves,

require clarification. It contends also that that portion of the Commission's Opinion No. 160, also filed November 17, 1947, finding Metropolitan "in trespass" [4] at York Haven is not justified by the law or the circumstances.

### As to the Provisions of Paragraph (A) (viii).

Metropolitan takes the position that since Section 3(13) [5] of the Act, 16 U.S.C.A. §

constructed, operated or maintained under valid federal authority and that the construction, operation and maintenance of the project was in violation of the Federal Power Act.

An answer was filed by Metropolitan setting up inter alia the defense that the Susquehanna River was not navigable water of the United States at York Haven and that the project therefore required no permit or consent from the United States. Prior to hearing before the Commission the United States Court of Appeals for the District of Columbia handed down its decision in Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App.D.C. 351, 123 F.2d 155, and certiorari was refused by the Supreme Court, 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205. Metropolitan then concluded that since the Susquehanna had been held to be navigable water of the United States at Holtwood, Pennsylvania, it would be held to be navigable water at the York Haven Project, a distance upstream from Holtwood of about 27 miles. Metropolitan then decided that it should make application for a license to the Commission.

[2] As follows:

"(A) A major license for a period effective January 1, 1938, and terminating June 30, 1970, be issued to Metropolitan Edison Company for the operation and maintenance of the project subject to the provisions of the Act, and the rules and regulations thereunder, such license to contain the usual conditions and provisions of licenses issued under Section 4 (e) of the Act for such projects and the following special conditions:

*     *     *     *     *     *     *

"(viii) The actual legitimate original cost and accrued depreciation of the project as of the effective date of the license, namely January 1, 1938, shall be determined in accordance with the Act and the Commission's rules and regulations, and the Licensee hereby agrees to accept such original cost less such accrued depreciation, so determined, as being the

net investment in the project as of such effective date;"

[3] As follows:

"(B) After the first 20 years of operation of the project under this license, namely after December 31, 1957, six (6) percent per annum shall be the specified rate of return on the net investment in the project for determining surplus earnings in accordance with the provisions of Section 10(d) of the Act for the establishment and maintenance of amortization reserves to be held until termination of the license, or in the discretion of the Commission, to be applied from time to time in reduction of the net investment in the project, and one-half of all surplus earnings in excess of six (6) percent per annum received in any calendar year shall be put into and held in such amortization reserves;"

[4] The statement is as follows:

"Since the project was built in a navigable water of the United States, it has been in trespass from the time of its original construction. A license should have been sought upon the passage of the Federal Water Power Act [Act of June 10, 1920, 41 Stat. 1063, now Part I of the Federal Power Act] in 1920 and the license which we tender could have been made effective as of 1920."

[5] As follows:

"(13) 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar costs of additions thereto. and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated *during the period of the license* from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar re-

796(13), defines "net investment" in a project as "the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission'", the Commission was without authority to order in subparagraph (viii) that depreciation be employed as a factor in estimating value. Metropolitan further asserts, as indeed does the Commission,[6] that the valuation determined by the formula prescribed by Paragraph (A) (viii) as a starting base will fix the maximum for which the United States will be held responsible on recapture, if such be effected subsequently, under the requirements of Section 14 of the Act, 16 U.S.C.A. § 807.[7] We think it is clear that the valuation imposed upon the York Ha-

ven Project by Paragraph (A) (viii) will serve as the base, throughout the period of regulation, for the establishment, inter alia, both of a reasonable rate of return and amortization reserves pursuant to Section 10(d).[8] In this connection we refer to the provisions of Section 4(b) and (e), 16 U.S. C.A. § 797(b) and (e), which provide respectively that the Commission is empowered to determine "the actual legitimate original cost of and the net investment in a licensed project * * *." and to issue licenses "for the purpose of constructing, operating, and maintaining" projects. Section 4(b) and (e) seems to be directed to new projects to be licensed under the Act, long in existence but never licensed such as York Haven. We refer also to Section 23 (a), 16 U.S.C.A. § 816 which provides for

---

serves, or expended for additions or betterments or used for the purposes for which such reserves were created. The term 'cost' shall include, insofar as applicable, the elements thereof prescribed in said classification, but shall not include expenditures from funds obtained through donations by States, municipalities, individuals, or others, and said classification of investment of the Interstate Commerce Commission shall insofar as applicable be published and promulgated as a part of the rules and regulations of the Commission;" Emphasis added.

[6] See pp. 9, 10 of the respondent's brief.

[7] As follows:

"Upon not less than two years' notice in writing from the commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 3 hereof, and covered in whole or in part by the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in the development, transmission, or distribution of power and which is then dependent for its usfulness upon the continuance of the license, together with any lock or locks or other aids to navigation constructed at the expense of the licensee, upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of

property taken, and shall assume all contracts entered into by the licensee with the approval of the commission. The net investment of the licensee in the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this Act, by the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: Provided, That the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this Act at any time by condemnation proceedings upon payment of just compensation is hereby expressly reserved."

[8] As follows:

"(d) That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license."

the licensing by the Commission of projects operating pursuant to purported authority of existing law or under "permit" and which states that "the fair value" of such projects shall "be deemed to be the amount to be allowed as the net investment of the applicant * * *". Admittedly the provisions of Section 23 are not applicable to the York Haven Project.

▮ To put it bluntly, there are hiatuses and inconsistencies in the Federal Power Act and, as was stated by Judge Learned Hand in Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787, 795, "* * * it is necessary * * * to break through the band of verbal logic at its weakest spot." In construing Section 3 (13) little aid is procured from the Interstate Commerce Commission "classification" [9] though it would appear generally that "accrued depreciation" on road, equipment and miscellaneous property of a railroad must be set up on the general balance sheet in conjunction with operating reserves.[10] This might be more persuasive than it is if we were not convinced that by definition Section 3(13) was intended to operate only in the period following the issuance and acceptance of a license. That this is so is made plain by the actual text which speaks of additions of costs minus certain items which shall "have been accumulated during the period of the license * * *." It follows therefore that the definition of "net investment" as "actual legitimate original cost * * *" of Section 3(13) cannot be employed to determine the base of the York Haven Project or to test the legality of the formula of Paragraph (A) (viii).

What statutory sanction then can the Commission find to justify the formula set out in Paragraph (A) (viii)? Section 6, 16 U.S.C.A. § 799, as the Commission points out, provides that each license "shall be conditioned upon acceptance by the licensee of all the terms and conditions of this Act and such further conditions, if any, as the Commission shall prescribe in conformity with this Act * * *." But these provisions do not authorize the formula of Paragraph (A) (viii) for there is nothing in the Act which expressly authorizes the Commission to employ the formula of the "actual legitimate original cost and accrued depreciation" in respect to the York Haven Project which, as the record shows, was completed approximately thirty-three years ago and is now, for the first time, seeking a license. Section 10(g), 16 U.S.C.A. § 803 (g), does, however, authorize the Commission to prescribe in a license "Such other conditions not inconsistent with the provisions of this Act as the Commission may require." Can this section be deemed to authorize Paragraph (A) (viii)?

▮ It is clear from the Act that Congress contemplated the licensing of new projects: see Section 3(13); and of old projects in existence under permit; see Section 23(a). Congress must also have had in mind the fact that there were many projects already in existence, not under permit. We think it was the Congressional intent by the enactment of Section 10(g) to give to the Commission wide latitude and discretion in the performance of its licensing and regulatory functions and that Congress must have contemplated the licensing by the Commission of old projects, such as York Haven, not under permit, under the provisions of Section 10(g).[11] We think it is clear that the conditions of Paragraph (A) (viii) are not inconsistent with the Federal Power Act, are not in the least arbitrary or unreasonable, and that therefore the Commission possessed the author-

[9] Neither party makes direct reference to the Classification in their briefs or asserts that it throws light on the question sub judice.

[10] See respectively paragraphs 775, 776, 777 and 774 of the Classification published by the Government Printing Office and effective July 1, 1914. See also the introductory letter of Fred W. Sweeney, Chief Examiner of Accounts, addressed "To Accounting Officers of Steam Railways", in which it is stated that "* * * separate accounts have been provided for accrued depreciation upon road, upon equipment, and upon miscellaneous physical property."

[11] The legislative histories of the Federal Power Act and the Federal Water Power Act, now Part I of the Federal Power Act, throw no light on this question.

ity to impose them on Metropolitan. Our reasons follow.

The "actual legitimate original cost and accrued depreciation of the project", the formula imposed by Paragraph (A) (viii) will effect the "fair value" required of "permit" projects by Section 23 (a). We may not conclude that an existing project, not under permit, should be put in a better position as to value for regulatory purposes under a federal license than an existing project under permit. On the other hand we can see no substantial reason why an existing project without permit should be in a worse position than an existing project under permit insofar as federal licensing is concerned. In any event, it cannot be asserted plausibly that the provisions of Paragraph (A) (viii) of the order sub judice are inconsistent with the provisions of Section 10(g). On the contrary by analogy the paragraph of the Commission's order finds a basis in Section 23. The Act must receive a practical construction, one which will enable the Commission to perform the duties required of it by Congress.[12] See Clarion River Power Co. v. Smith, 61 App.D.C. 186, 59 F.2d 861, 863. We think that Section 10(g) authorized the Commission to impose the formula of Paragraph (A) (viii) and we so rule.

The formula set out by the Commission in Paragraph (A) (viii) will form the basis for the application of the Commission's regulatory functions in respect to the York Haven Project but we cannot and do not decide that the base created by the formula of the paragraph will, as the Commission contends and as Metropolitan fears, "fix the maximum" for which the United States will be held liable on recapture under Section 14. That question is not before us and we may not give an advisory opinion respecting it. Section 14 provides expressly that "The net investment of the licensee in

the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing." The recapture provisions of Section 14 may never be exercised by the United States. We think it is clear that they cannot be exercised in fact without further authorization by Congress and under appropriations which have not yet been made. But it is clear that the meaning of the phrase "the net investment of the licensee in the project or projects taken" employed in Section 14 cannot be properly before us on the instant review.

To sum up our conclusions upon this aspect of the case to the end that there may be no misunderstanding we state again that the formula prescribed by Paragraph (A) (viii) will supply the base on which the York Haven Project may be regulated by the Commission under license. We do not hold that the base of the formula is "the net investment" of Section 14. That question must await future determination as prescribed by the Act.

As to the Provisions of Paragraph (B).

The provisions of Paragraph (B) of the Commission's order of November 7, 1944 were amended by its order of November 17, 1947. Metropolitan asserts that the provisions of the paragraph as amended require further clarification. We do not agree. The Commission's Opinion No. 160, read in conjunction with the letter of November 25, 1947 of Mr. Leon M. Fuquay, Secretary of the Commission, to Mr. Harold J. Ryan, attorney for Metropolitan, leaves no doubt that the question raised by Metropolitan, as to whether the earnings from which amortization reserves are to be set aside would be annual earnings or those earnings accumulated over a given period, remains open for future determination by the Commission.

---

12 The formula applied by the Commission in the instant case has the sanction of extended prior administrative use. It was applied first by the Commission in 1927 in connection with several constructed projects for which prior authorizations were lacking. Utah Power and Light Company, 7 FPC Ann.Rept. 120- 128. It has been applied as late as 1947 in Southern California Edison Co., 5 FPC 695 and 698. The formula has been consistently exercised by the Commission. Such administrative construction is entitled to great weight. United States v. Cerecedo Hermanos y Compania, 209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821.

**As to the Objection of Metropolitan to the Finding by the Commission that the York Haven Project Is "in Trespass."**

The statement objected to is, as we have stated, in the opinion of the Commission. This court possesses no power to correct a statement in an opinion of the Commission albeit it would be within our province to state that the Commission's finding upon a pertinent point was in error if we so concluded. The Commission's statement, however, is not germane to any substantial issue presented for our determination. It is clear and conceded by all that the York Haven Project was erected in 1904 and has had neither permit nor license. The Commission has not attempted to impose any penalty on Metropolitan by reason of the facts last mentioned. We therefore find it unnecessary to discuss the statement in this opinion.

The order of the Commission of November 7, 1944, as amended by that of November 17, 1947, will be affirmed.