# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1071

_____

| | |
|---|---|
| The Coalition for the Fair and Equitable Regulation of Docks on the Lake of the Ozarks, | * * * * * |
| Petitioner, | * |
| | * Petition for Review of an Order of the |
| v. | * Federal Energy Regulatory |
| | * Commission. |
| Federal Energy Regulatory Commission, | * * |
| Respondent, | * * |
| Union Electric Company, doing business as AmerenUE, | * * * |
| Intervenor - Intervenor on Appeal. | * |

_____

Submitted: November 14, 2001

Filed: July 24, 2002

_____

Before BOWMAN, JOHN R. GIBSON, and STAHL,[1] Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

_____

[1] The Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

The Coalition for the Fair and Equitable Regulation of Docks on the Lake of the Ozarks petitions for review of a Federal Energy Regulatory Commission decision denying its challenge to user fees assessed on docks at the Lake. The Lake is part of a hydropower project on the Osage River that is owned and operated by Intervenor Union Electric Company under a license from FERC that authorizes Union Electric to allow certain uses of the Lake for the benefit of the public and to recoup its costs of doing so, subject to oversight by FERC. Union Electric established a program requiring owners of docks extending into the Lake to obtain permits for the docks and to pay user fees. The Coalition, a group of lake-front property owners, filed a complaint with FERC contending that FERC could not delegate to Union Electric the power to impose the fees; that the fees constituted an illegal tax or toll; that FERC should order discovery and a hearing on the Coalition's complaint; and that the fees were unreasonable. FERC denied the Coalition's complaint and its request for rehearing. The Coalition now petitions for review of FERC's decision, reiterating the arguments it made before FERC as well as some additional ones. We deny review.

The Federal Water Power Act of 1920 authorized the Federal Power Commission (now the Federal Energy Regulatory Commission) to issue licenses to public or private licensees to build hydropower projects on navigable waters of the United States. 16 U.S.C. § 797(e) (2000). The Water Power Act was

> the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.

First Iowa Hydro-Elec. Coop. v. Fed. Power Comm'n, 328 U.S. 152, 180 (1946). Congress later added the requirement that FERC, in considering whether to license a project, take into account not only the "power and development purposes for which

licenses are issued," but also "the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality." 16 U.S.C. § 797(e) (as amended by Pub. L. No. 99-495, § 3(a) (1986)) (emphasis added).

To promote recreational use of hydropower projects, FERC has adopted a regulation placing responsibility on project licensees to develop their project's recreational resources and permitting licensees to recruit the help of public agencies and private interests in this endeavor. 18 C.F.R. § 2.7 (2001). Specifically, the regulation states: "The Commission will not object to licensees and operators of recreational facilities within the boundaries of a project charging reasonable fees to users of such facilities in order to help defray the cost of constructing, operating, and maintaining such facilities." Id.

Article 41 of Union Electric's license for the Osage Project allows Union Electric to grant permission for certain uses of the project lands and waters without prior Commission approval, if the use is "consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project." That authority, however, comes with the concomitant responsibility to "supervise and control the uses and occupancies for which [Union Electric] grants permission." Under subsection b of Article 41, Union Electric can allow such uses as "non-commercial piers, landings, boat docks, or similar structures and facilities." At the same time, Union Electric is charged with the responsibility of making sure that any such structures are of suitable design and are well-maintained. The license provides: "To implement this paragraph (b), the Licensee may, among other things, establish a program for issuing permits for the specified types of use and occupancy of project lands and waters, which may be subject to the payment of a reasonable fee to cover the Licensee's costs of administering the permit program." FERC reserved the right to require Union Electric to file its standards, guidelines, and procedures for

-3-

implementing the land-use article, and FERC also retained the right to require modifications of these instruments.

Pursuant to Article 41, after public notice and comment, Union Electric adopted permit requirements for use and occupancy of project land and waters. Anyone desiring to build or modify structures, including docks, on project property, was required to apply for a permit. Effective January 1, 1999, Union Electric adopted two "User fees," one covering all permits for new docks and modifications to existing docks, and the other being a user fee applicable to docks occupying more than 3000 square feet of water space. The fee for new construction and modification was set at a single payment of $400 for docks of between 1800 and 3000 square feet and $250 for docks less than 1800 square feet. For docks larger than 3000 square feet, the fee was a recurring annual fee of $.045 per square foot. Union Electric's permit instructions stated: "Total fees collected by [Union Electric] will be applied to [Union Electric's] shoreline management costs at the Lake of the Ozarks."

The Coalition wrote FERC, asking it to rule that FERC itself had no authority to allow Union Electric to charge dock user fees at all because they amounted to a "tax for the use of public waterways," and further, that the actual fees on the Osage project were unreasonable because they exceeded the cost of reviewing the permit applications and inspecting the docks.

The Director of FERC's division of Licensing and Compliance responded with a letter dated August 5, 1999, generally affirming that Union Electric was authorized under Article 41 of the Osage project license to charge a reasonable fee to cover costs of administering the permit program and concluding that Union Electric's costs of administering the permit program exceeded the fees it collected. The Director did, however, advise Union Electric that certain expenses it claimed--its shoreline cleaning, fish stocking, and mosquito spraying costs--were not properly includable

as costs of administering the permitting program and therefore should not be supported by dock permit fees.

Not satisfied with the decision articulated in the Director's August 5 letter, the Coalition filed a complaint with FERC, which the agency denied. FERC first considered the argument that the Federal Power Act does not authorize FERC to impose user fees or to allow Union Electric to do so. FERC reviewed the Act, and found that Congress expressly contemplated the use of hydropower projects for recreational purposes and that Congress gave FERC "wide latitude and discretion in the performance of its licensing and regulatory functions." Union Electric Co., 90 FERC 61,249, 2000 WL 280769, at *3 (March 16, 2000) (citing 16 U.S.C. § 803(g) and quoting Metro. Edison Co. v. Fed. Power Comm'n, 169 F.2d 719, 723 (3d Cir. 1948)). It is FERC's policy to encourage development of recreational facilities at licensed projects, and as part of that policy, to allow the licensee to recoup the resulting expenses. An example of this policy is found at 18 C.F.R. § 2.7: "The Commission will not object to licensees and operators of recreational facilities within the boundaries of a project charging reasonable fees to users of such facilities in order to help defray the cost of constructing, operating, and maintaining such facilities." FERC concluded that Congress has granted it the power to issue the kind of license it granted to Union Electric and to permit Union Electric to recoup certain expenses through user fees. 2000 WL 280769, at *4-5.

The Coalition further argued that the user fees amounted to a tax, to which FERC responded that money charged in return for a benefit of which the beneficiary has voluntarily availed itself is not a tax, but a fee. FERC reasoned that Union Electric "is not taxing the private property of the dock owners, but imposing a fee for allowing the dock owners to extend their facilities onto project property." Id. at *6.

The Coalition argued that Article 41 of the license gave Union Electric authority to recover only the cost of issuing permits, but not any other shoreline management expenses. Putting aside the expenses the Director had already excluded (fish-stocking, mosquito-spraying, and adopt-a-shoreline programs), FERC concluded that the remaining categories of expenses claimed by Union Electric (property management, permit processing and enforcement, derelict dock removal, and lake survey expenses) were of the sort Union Electric could recoup as "cost[s] of administering the permit program." Id. at *7. Union Electric reported allowable expenses of $945,000 for 1999, whereas its projected fees from the permit program would only come to $615,000. This shortfall led FERC to conclude that the permit program fees were not excessive. Id. at *8.

The Coalition also argued that the user fees were a toll, prohibited by 33 U.S.C. § 565 (2000). FERC rejected this characterization, since the money was not collected for navigating the river. Id. at *6.

FERC also rejected the Coalition's argument that the permit program interfered with dock owners' property rights: "The permit program does not assess property owners for structures placed on their own property but for the privilege of extending their structures into the Lake of the Ozarks, which is project property." Id.

Because FERC found it possible to decide on the existing record the issues the Coalition raised, it declined to assign the matter to an administrative law judge for a hearing, as the Coalition requested. Id. at *8.

The Coalition sought rehearing. It contended that FERC had erred by refusing to order a formal evidentiary hearing. However, FERC reasoned that an agency has discretion to deny an evidentiary hearing where a dispute can be resolved on written submissions. Union Electric Co., 93 FERC 61,158, 2000 WL 1701202 (Nov. 13, 2000). FERC concluded that the Coalition had not raised any factual disputes that

-6-

required an evidentiary hearing. The questions concerning FERC's authority to allow Union Electric to impose permit fees were legal ones, not dependent on the resolution of factual disputes. As for the propriety of the particular fees imposed, on rehearing FERC obtained from Union Electric a more detailed accounting for the expenses it claimed to be recouping through permit fees. After reviewing the detailed expense submissions, FERC concluded, "The types of expenses that [Union Electric] has described seem to us, on the whole, to be related to the granting of permission to other entities or individuals to place structures on project lands or in the project reservoir, or otherwise to obtain uses or interests in the project lands and waters, and to the enforcement of the program established for granting these types of permission." Id. at *5. FERC determined that the Coalition had not shown that the permit program fees are discriminatory or unreasonable, and therefore it denied the request for rehearing. Id. at *6. The Coalition filed this petition for review.

I.

The Coalition raises five questions for review, some of which include subparts. As a threshold issue, FERC and Union Electric object to this court considering contentions that the Coalition failed to raise in its application for rehearing before FERC. The three arguments in question are the Coalition's contentions (1) that the Army Corps of Engineers, not FERC, has authority over the construction of docks on the Lake of the Ozarks; (2) that FERC's decision violates 16 U.S.C. § 821 and Missouri riparian rights; and (3) that the permit program violated the Coalition's constitutional right to equal protection of the laws. The Coalition concedes that only arguments raised in the rehearing application should be reviewable in this court under 16 U.S.C. § 825*l*(b) (2000) (with exception for cases in which there was reasonable ground for failure to raise objection), but contends it raised the arguments adequately. However, the Coalition's brief does not show that it raised the first two arguments in any recognizable form and only arguably shows that it raised the equal protection argument by using the word "discriminatory." Therefore, we will decline to exercise

jurisdiction over the arguments concerning the Army Corps of Engineers and state riparian rights, but will entertain the equal protection argument.

FERC's findings of fact are conclusive if they are supported by substantial evidence. 16 U.S.C. § 825*l*(b). As for legal questions, FERC's interpretation of the Federal Power Act, the statutory scheme it is charged with administering, is entitled to considerable weight under the principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45 (1984). We will defer to an agency's interpretation of such a statute if that interpretation is consistent with the plain meaning of the statute or is a permissible construction of an ambiguous statute. See Escudero-Corona v. INS, 244 F.3d 608, 613 (8th Cir. 2001). Similarly, we accord substantial deference to an agency's interpretation of its own regulation, which we are bound to uphold unless it violates the Constitution or a federal statute, or unless the interpretation is "plainly erroneous or inconsistent with the regulation." Univ. of Iowa Hosp.s and Clinics v. Shalala, 180 F.3d 943, 950-51 (8th Cir. 1999) (internal quotation marks omitted). However, we review de novo constitutional questions, such as the Coalition's equal protection and due process claims. Escudero-Corona, 244 F.3d at 614.

II.

The Coalition's principal argument is that the Federal Power Act does not confer on FERC the power to regulate the use of project lands by anyone other than Union Electric, the licensee. This argument flies in the face of the Supreme Court's assessment in First Iowa Hydro-Electric Coop. v. Federal Power Commission, 328 U.S. 152, 180 (1946), that Congress intended to enact "a complete scheme of national regulation, which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbors Acts and other federal laws previously enacted." The Act commands FERC to see to

it that projects are developed to serve various public needs, including recreation. 16 U.S.C .§§ 797(e), 803(a)(1). Congress gave FERC the means to accomplish its tasks through statutory provisions vesting FERC with power and discretion. See 16 U.S.C. §§ 799, 803(g), and 825h; Niagara Mohawk Power Corp. v. Fed. Power Comm'n, 379 F.2d 153, 158-59 (D.C. Cir. 1967). FERC has discharged its duty by adopting regulations encouraging licensees to develop recreational uses of the project lands, placing on them the responsibility to assure that such uses are consistent with federal law and policy, and allowing them to charge reasonable user fees to defray the costs they incur in constructing, operating, and maintaining recreational facilities. 18 C.F.R. § 2.7. Similarly, FERC's ruling in this case allows Union Electric to recoup expenses it incurs in making available project lands for recreational use. A holding that FERC could not take any action that would regulate the conduct of anyone other than the licensee, no matter how directly other persons' conduct might affect a hydro-power project, would deprive FERC of the power to effectuate the goals it was directed to accomplish and would negate the broad grants of power and discretion in the Federal Power Act. The Coalition's argument finds no support in the Federal Power Act or in cases interpreting it and we therefore reject it.

As part of the argument that FERC has no authority to regulate the public's use of project lands, the Coalition briefly argues that the user fees are a tax, which can only be levied by Congress. A tax is a general charge not correlated to a particular benefit, whereas a fee is a charge exacted in exchange for a benefit of which the payor has voluntarily availed itself. See Nat'l Cable Television Ass'n v. United States, 415 U.S. 336, 340-41 (1974). A fee may properly be based on the cost of providing a benefit to the recipient. Neb. Trails Council v . Surface Transp. Bd., 120 F.3d 901, 905-07 (8th Cir. 1997). The fees in this case were imposed as a result of the dock owners' choice to avail themselves of the privilege of having a dock on project land, and the fees subsidized a permit program that benefitted the dock owners. There is no basis for characterizing the charges in this case as a tax.

## III.

The Coalition argues that Article 41 of the license violates the non-delegation doctrine of A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), because there is no intelligible statutory principle to which Union Electric is required to conform. To the contrary, 16 U.S.C. § 803(a)(1) (2000) guides FERC's administration of projects by requiring FERC to assure that the project be adapted

> to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife . . . and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 797(e) of this title.

There is thus no grant of decision-making authority to FERC without an intelligible guiding principle. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001). Furthermore, FERC retains authority to require the modification of the project and its plans and specifications, to accomplish the outlined goals. 16 U.S.C. § 803(a)(1). Therefore, the license represents no real delegation of power to Union Electric, because FERC retains the right to require modification of Union Electric's program. In fact, in this case, FERC reviewed the expenses Union Electric claimed and rejected some of those expenses as ineligible for recoupment.

## IV.

The Coalition challenges the permit program as a violation of its constitutional right to equal protection. Fifth Amendment equal protection claims are analyzed in the same way as equal protection claims brought under the Fourteenth Amendment. United States v. McClinton, 815 F.2d 1242, 1244 n.3 (8th Cir. 1987). If a classification does not burden a fundamental right or target a suspect class, it will be

upheld if it bears a rational relationship to a legitimate end. <u>Weiler v. Purkett</u>, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc). The classification the Coalition complains of is Union Electric's distinction between docks larger than 3000 square feet, which are subject to the annual fee, and docks 3000 square feet and smaller, which are subject to the one-time assessment of $400 or $250, depending on size. The expenses which Union Electric seeks to recoup include inspection expenses, and it is rational to expect that Union Electric would incur greater expenses in connection with larger structures and that owners of larger structures would enjoy greater benefits from being allowed to use project lands for their docks. The classification therefore passes the rational basis test.

V.

The Coalition contends that FERC's refusal to assign its complaint to an administrative law judge for discovery and an evidentiary hearing violates the Coalition's right to due process and is contrary to 16 U.S.C. § 825f (2000).

Congress provided that FERC itself should prescribe its own hearing procedures:

> All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

16 U.S.C. 825g (2000). "[T]he formulation of administrative procedures is 'basically to be left within the discretion of the agencies.'" <u>Crete Carrier Corp. v. United States</u>,

577 F.2d 49, 50 (8th Cir. 1978) (quoting <u>Vermont Yankee Nuclear Power Corp. v.</u> <u>Natural Res. Def. Council, Inc.</u>, 435 U.S. 519, 524 (1978)).

FERC complaint procedures provide that cases can be decided on the pleadings. 18 C.F.R. § 385.206(g)(2) (2001). FERC stated in its original order: "Because we find it possible to assess the reasonableness of [Union Electric's] fees on the existing record, we will not assign the proceeding to an Administrative Law Judge for a formal evidentiary hearing, as the Coalition requests." 90 FERC 61,249, 2000 WL 280769, at *8. In its disposition of the rehearing application, FERC rejected the Coalition's contention that its claim could only be clarified by discovery and a hearing: "While trial-type procedural measures may be used to develop a record and resolve issues of fact, they are not intended to be used as a cure for a complaint that fails to inform the Commission completely and clearly as to the issues and factual disputes that the complainant wishes the Commission to address." 93 FERC 61,158, 2000 WL 1701202, at *3. The Coalition's complaint focused primarily on the issue of whether FERC was authorized to allow the imposition of the user fees, which is a legal, not a factual, issue. The Coalition also alleged that the amount of fees was not reasonable; FERC concluded it was reasonable, because the fees generated were substantially less than Union Electric's expenses associated with allowing the docks to be constructed and maintained on project lands. The Coalition did not present FERC with any reason to doubt the accuracy of the information it received from Union Electric regarding its expenses. FERC's decision to deny a hearing on the ground that there were no material factual disputes was within its discretion and did not violate the Coalition's constitutional rights.

VI.

Finally, the Coalition contends that FERC's determination was not supported by substantial evidence. In particular, the Coalition attacks FERC's conclusion that Union Electric's allowable expenses exceeded the fees generated. FERC's conclusion

-12-

was based on Union Electric's August 16, 2000 submission detailing its expenditures for property management, permit processing, and enforcement; derelict dock removal; and lake survey. In 1999, those expenses totaled $1,228,344, whereas fees generated from the permit program totaled $615,000. The Coalition attacks the labor costs listed by Union Electric, which should have been decreased to show that the employees performed other duties that would not be attributable to shoreline management. However, FERC's brief demonstrates that, even reducing those labor costs to reflect time the Coalition contends was spent on other duties, Union Electric still has allowable labor costs of $534,099, which, with $58,413 in derelict dock removal costs, $28,965 for shoreline inspection, $18,424 for lake survey, and $79,685 for legal fees, would still exceed the fees generated. FERC's factual finding was supported by substantial evidence.

We have reviewed the Coalition's various subsidiary arguments and conclude they do not merit individual discussion.

We deny review of the FERC order, and we grant Union Electric's motion to strike the Coalition's post-argument letter brief of November 16, 2001.

A true copy.

ATTEST:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-