# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-2754

_____

|  |  |  |
|---|---|---|
| Keith Barthel; Dorothy Barthel, | * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Nebraska. |
| United States Department of | * | |
| Agriculture, Daniel Glickman, | * | |
| Secretary, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  January 21, 1999

Filed:  June 18, 1999

_____

Before McMILLIAN, BEAM, and LOKEN, Circuit Judges.

_____

BEAM, Circuit Judge.

Keith and Dorothy Barthel (the Barthels) appeal the district court's decision upholding the United States Department of Agriculture's (USDA) limitation on the

dredging of a drainage ditch.[1] The limitation leaves the Barthels' hay meadow flooded. We reverse and remand.

## I.    BACKGROUND

In 1916, the South Fork of the Elkhorn river was straightened to improve drainage. The straightened portion, referred to as "the ditch," allowed certain land to be used for hay and pasture. The ditch was dredged in 1951 to clean out obstructions and silting which had occurred through the passage of time and caused water to back-up. In 1957, the Barthels purchased their 450-acre hay meadow. The meadow is drained by the ditch which runs along the south side of the Barthels' property. The ditch also runs on adjacent property owned by Gene and Erna Liermann. The Liermanns' land is directly downstream from the Barthels' tract.

The Barthels, together with a neighbor, dredged the ditch again in 1983. The Liermanns gave permission for this work to be done to the portion of the ditch on their land as well. The following year the county replaced a culvert under a county road where it crosses over the ditch. Road department workers testified that sometime in 1986, the culvert was lowered by approximately eighteen inches. In the interim period, on December 23, 1985, the Food Security Act (the Act) became effective. The Act contains federal Swampbuster provisions aimed at preserving wetlands. See Gunn v. USDA, 118 F.3d 1233, 1235 (8th Cir. 1997), cert. denied, 118 S. Ct. 1042 (1998).

By 1987, the ditch had again become obstructed with debris and clutter, allegedly caused by the Liermanns' cattle crossing the ditch. The Barthels sought to

_____

[1]The Barthels also filed a motion asking that we consider certain color photographs. We ordered the motion taken with the case, and now deny the request. The administrative record contains several adequate representations and other supporting photographs.

dredge the ditch on the Liermanns' property or in the alternative have the Liermanns clean that portion pursuant to their state law obligations. This time the Liermanns refused, and eventually the Barthels filed suit in Nebraska state court. A mandatory injunction was issued requiring the Liermanns to clean out the portion of the ditch on their property "so that water will flow." Admin. R. at 327 (state court injunction). Because cleaning and maintenance of the ditch impacted a potential wetland area, the USDA,[2] the agency responsible for enforcement of the Swampbuster provisions, became involved. Initially, the USDA determined that the cleaning and maintenance required by the state court did not violate any Swampbuster provisions. However, after the Liermanns appealed, the USDA reversed course. Based upon reliable evidence that the culvert was lowered eighteen inches in 1986, the USDA determined the grade and depth of the ditch required under the Swampbuster provisions and implementing regulations, and refused to allow dredging that exceeded eighteen inches above the bottom of the downstream culvert. At that level and grade, the Barthels' hay meadow is flooded.

Following exhaustion of administrative appeals, the Barthels brought suit in federal district court. The district court affirmed the USDA's decision, and the Barthels appeal. The Barthels argue that the agency interpretation of the federal statute is incorrect. They contend that although they were able to produce hay, and pasture their milk cows on the land before December 23, 1985, the agency's determination has left their land completely and permanently underwater.[3]

---

[2]This function is delegated to the Soil Conservation Service (SCS) which has been replaced by the National Resource Conservation Service (NRCS). 7 U.S.C. § 6962. For simplicity, the SCS or NRCS will be referred to as "the agency" or the USDA.

[3]The Barthels also question several procedural deficiencies. In light of our conclusion, we need not address these issues.

## II.    DISCUSSION

"In order to combat the disappearance of wetlands through their conversion into crop lands, Congress passed a law known commonly as 'Swampbuster.'" Gunn, 118 F.3d at 1235 (citing Food Security Act of 1985 §§ 1201, 1221-23, 16 U.S.C. §§ 3801, 3821-24).  The law denies eligibility for several federal farm-assistance programs if wetlands are converted to agricultural use.  See National Wildlife Fed'n v. Agricultural Stabilization and Conservation Serv., 955 F.2d 1199, 1200 (8th Cir. 1992).[4]  In

_____

[4]The statute provides in pertinent part:

(6)(A)   The term 'converted wetland' means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if–
> (i) such production would not have been possible but for such action; and
> (ii) before such action–
>> (I) such land was wetland; and
>> (II) such land was neither highly erodible land nor highly erodible cropland.

(B)  Wetland shall not be considered converted wetland if production of an agricultural commodity on such land during a crop year–
> (i) is possible as a result of a natural condition, such as drought; and
> (ii) is not assisted by an action of the producer that destroys natural wetland characteristics.

16 U.S.C. § 3801.

(a) Production on converted wetland
Except as provided in this subchapter and notwithstanding any other provision of law, any person who in any crop year produces an agricultural commodity on converted wetland, as determined by the

-4-

addition, the law provides for exemptions, namely wetlands that were converted before December 23, 1985–the effective date of the law.[5]  See Gunn, 118 F.3d at 1235.  Land meeting this exemption can be maintained as it was prior to the effective date of the Act without loss of federal benefits.  Neither the Barthels nor the USDA dispute that the land in question here, a 450-acre hay meadow, was altered by the ditch and drained prior to the effective date of the Act.  See Barthel v. Glickman, No. 4: 96CV3034, mem. op. at 7 (D. Neb. May 1, 1998).  The only dispute is the extent to which the land was altered and can now be maintained.  The Barthels contend that the land was previously used for hay production and pasture and should be maintained at the level of prior use.  The USDA argues that the current level of the ditch should be maintained, whatever the effect upon the property.

The regulations implementing the Swampbuster provisions classify the Barthels' land as "other wetland area" because it is seasonally flooded or ponded but was

---

Secretary, shall be–
    (1) in violation of this section; and
    (2) ineligible for loans or payments in an amount determined by the Secretary to be proportionate to the severity of the violation.

Id. § 3821(a).

[5]The law provides that:

(b)  Exemptions
No person shall become ineligible under section 3821 of this title for program loans or payments under the following circumstances:
    . . . .
    (A) A converted wetland if the conversion of the wetland was commenced before December 23, 1985.

Id. § 3822(b).

"manipulated prior to December 23, 1985." 7 C.F.R. § 12.32(a)(3) (1992). "Persons may continue to farm such wetlands . . . as they did prior to December 23, 1985. However, no action can be taken to *increase effects* on the water regime beyond that which existed on such lands" on or before that date. Id. § 12.33(a) (1992) (emphasis added).

As noted, the Barthels had manipulated the water regime on their land before the effective date of the Act by improving drainage. The record provides uncontroverted examples of this. When the time came to clean the drainage ditch, the USDA denied permission despite a state mandatory injunction. The agency denied permission based upon the National Food Security Act Manual (the Manual), which more specifically defines the technical application of the Swampbuster provisions. See id. § 12.6(c).

The Manual classifies the Barthels' land as "farmed wetland pasture or hayland." See NFSAM § 514.23.[6] For farmed wetland, the Manual provides that the land can be used as it was before December 23, 1985, including "managed for pasture or hayland and the drainage or other hydrologic manipulations can be maintained, but not improved." Id. § 514.23(d). The Manual goes on to state that a hydrologic manipulation can be maintained to the same "scope and effect" as before December 23, 1985. Id. § 515.10(a). The Manual concludes that the agency "will determine the scope and effect of original manipulation on all farmed wetlands." Id. § 515.11(b).

To determine the original scope and effect of the manipulation, the USDA focused solely on the depth of the ditch that drains the hay meadow. In essence, the USDA interprets the manipulation to be the ditch. This led all involved to drudge through the mud of determining its precise depth. The agency argues, with supporting

_____

[6]The Manual provides that "[f]armed wetland pasture or hayland (FWP) are wetlands that: were manipulated and used for pasture or hayland prior to December 23, 1985, still meet wetland criteria, and are not abandoned." NFSAM § 514.23(a).

evidence, that the level of the culvert on or before December 23, 1985, was eighteen inches higher than its current level and as a result the ditch can only be maintained at that level. Unfortunately, this results in flooding on the Barthels' land. The Barthels challenge the agency's interpretation of the Swampbuster provisions and argue that maintenance of the manipulation should allow them to use the land as they did prior to the passage of the Act.

"We must uphold the [agency's] decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Von Eye v. United States, 92 F.3d 681, 685 (8th Cir. 1996) (quoting 5 U.S.C. § 706(2)(A)). Yet, an "overreaching and erroneous interpretation of the statute" cannot be in "accordance with law." Downer v. United States, 97 F.3d 999, 1010 (8th Cir. 1996) (Beam, J., concurring and dissenting). Certainly there is no worse statute than one misunderstood by those who interpret it. We conclude that the agency's interpretation misses the clear focus of the Swampbuster provisions and the implementing regulations.

The Act's proclaimed purpose is to preserve wetlands, or, if wetlands are altered, to preserve the conditions as altered. The Act says nothing about preserving the precise depth of drainage ditches or culverts. The government emphasizes that "'[w]etlands are a priceless resource whose contributions have long gone unrecognized.'" Appellee's Brief at 12 (quoting H.R. Rep. No. 99-271, pt. 1, at 87 (1985), reprinted in 1985 U.S.C.C.A.N. 1103, 1190). However, a drainage ditch is not the envisioned protected area. The agency's implementing regulations also focus on the wetlands. Under the regulations, farming of a wetland should be maintained at the level that was achieved prior to the Act. The "water regime" is maintained, not necessarily the ditch and culvert levels. See, e.g., Gunn, 118 F.3d at 1235 (focusing on the notion that a person cannot "improve the land's drainage"). As further evidence of this point, the current regulation on "use of wetland and converted wetland" provides that changes in the watershed due to human activity which increases the water regime on a person's

land, can result in a person being allowed "to adjust the existing drainage system to accommodate the increased water regime." 7 C.F.R. § 12.33(a).

This is not to say that the level of a ditch or culvert cannot provide an accurate indication of the water regime which previously existed. In fact, the Manual states that "any other available information relating to systems installed before 12/23/85" can be applicable in determining the "original scope and effect" of a wetland manipulation. NFSAM § 515.11(e). In the Barthels' case, the USDA's findings for the ditch and culvert depths apparently conflict with the water regime that existed prior to December 23, 1985. In such a conflict, the government's position is that the level of the ditch should win, at the expense of the prior conditions of the land. In short, the means are more important than the ends. We disagree. The unambiguous focus of the statute and implementing regulations is to maintain the status quo of the manipulated wetlands–not the drainage ditch. And a technical determination that establishes the level of a culvert in a ditch, but which produces a result contrary to the previous status quo of the wetlands cannot stand.[7] The statute and regulations mandate that the Barthels should be able to have the water and farming regime they had before December 23, 1985.

The government also maintains that the authority granted to the agency to "determine the scope and effect of [the] original manipulation," id. § 515.11(b), gives

---

[7]An expert should calculate the dredging necessary to allow the Barthels to have the same use of their land as they did previously. This does not mean that the Barthels get the same use of their land no matter the circumstances. For example, if there is high water from unusual amounts of rain, the Barthels cannot automatically dig the ditch deeper. They cannot exceed the original "scope and effect." Illustrative of this point is Keith Barthel's testimony that "traditionally in the spring the ditch would be frozen for a time and that 100 to 150 acres would flood until the ditch thawed. He also testified that the reed canary grass could survive this 3- to 4-week flood condition and, by June, could provide sufficient palatable food to feed all his cattle." Barthel v. Liermann, 509 N.W.2d 660, 663 (Neb. Ct. App. 1993).

discretion to select "any pre-December 23, 1985, manipulation 'which can be determined by reliable evidence.'" Barthel, mem. op. at 9 (quoting USDA's brief). Thus, if the agency had reliable evidence about the ditch level in 1965, then the Barthels would be stuck with those findings, even if in 1983 (still before the effective date of the Act), more far reaching modifications were made.[8]

The burden is on the government to show that the proposed maintenance, in this case cleaning the ditch so that the hay meadow is not underwater, exceeds the scope and effect of the original manipulation. Cf. Downer, 97 F.3d at 1009 (Beam, J., concurring and dissenting) (stating that it is the burden of the agency to prove ineligibility for benefits). However, this does not give the agency the right to arbitrarily define what the original scope and effect was. Is it arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for the agency to pick an original manipulation regardless of how it affects the use of the land?

We are presented with a factual setting that is cyclical. The record shows that the ditch is continually silted-in by natural conditions and animal traffic and must be periodically cleaned out. If we accept the government's argument, the USDA could select a level for the original manipulation, either intentionally or unintentionally, which is at the end of the natural cycle–just before the periodic clean-up. This would essentially redefine the cycle. Thus, in the government's view, if partial flooding occurred just before the clean-up, the flood level would be the *best* the Barthels could expect for use of their land. An ipse dixit determination like this would drastically reduce the use of the land and even leave it underwater–reviving a wetland. Cf. Von

---

[8]It was the Liermanns' "belief that the dredging of the ditch in 1983 made the ditch deeper than it originally had been." Barthel, 509 N.W.2d at 663. At oral argument, counsel for the government did concede that the Barthels are entitled to the best drainage of their land, on or before December 23, 1985, that they can prove with reliable evidence.

<u>Eye</u>, 92 F.3d at 685 (concluding that the agency did not arbitrarily deny an exemption to the Swampbuster provisions and even allowed "the advantages of an exemption longer than strictly provided for by the statute and regulations"). This interpretation conflicts with the Act considered as a whole.

## III.   CONCLUSION

Under the federal Swampbuster provisions and the implementing regulations, the Barthels are entitled to farm their land as they did on or before December 23, 1985, "so long as the previously accomplished drainage or manipulation is not significantly improved upon, so that *wetland characteristics* are *further* degraded in a significant way." <u>Gunn</u>, 118 F.3d at 1238 (emphasis added). We therefore reverse and remand this matter to the district court with instructions that the case be remanded to the agency for a hearing and determination of the wetland characteristics and associated use of the Barthels' 450-acre hay meadow, prior to December 23, 1985, and the necessary dredging and cleaning of the ditch to accomplish that water and farming regime.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.