**Dorothy CLARK, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Mike Johanns, Secretary, Defendant.**

No. 4:06–cv–00473.

United States District Court, S.D. Iowa, Central Division.

June 25, 2007.

Thomas A. Lawler, Lawler & Swanson, PLC, Parkersburg, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, Chief Judge.

### I. INTRODUCTION

Plaintiff, Dorothy Clark ("Clark"), seeks judicial review of Defendant, the United States Department of Agriculture's (the "USDA" or the "Agency") decision that designated five acres of Clark's farm as wetlands, and a subsequent decision that designated .9 acres as converted wetlands under 16 U.S.C. § 3801, thereby making her ineligible for certain federal benefits under 16 U.S.C. § 3821. In particular, Clark appeals a decision issued on December 29, 2005, by M. Terry Johnson, Deputy Director of the USDA National Appeals Division ("NAD"). In that decision, Deputy Director Johnson upheld Hearing Officer James R. Holman's October 25, 2005 decision finding: (1) that the five acres designated as wetlands met all the criteria for wetlands, including wetland hydrology, hydric soil, and hydrophytic vegetation; (2) that Clark converted .9 acres of wetland; and (3) that Clark did not establish that the wetland conversion had minimal effect.

### II. PROCEEDINGS

Clark filed a Complaint (Clerk's No. 1) in this Court on September 29, 2006, and the USDA filed an Answer (Clerk's No. 4) on November 21, 2006. On December 7, 2006, the parties agreed to submit the case on the certified administrative record and written briefs, rather than to proceed with trial. Clerk's Nos. 7–8. The USDA filed a certified administrative record on December 20, 2006. Clerk's No. 9. Clark filed a trial brief (Clerk's No. 10) on February 5, 2007, and the USDA filed a trial brief (Clerk's No. 13) on March 19, 2007. Clark filed a reply brief (Clerk's No. 14) on March 30, 2007. Clark requested oral argument, however, the Court finds that such argument would not materially aid the resolution of this case. Accordingly, the matter is fully submitted.

### III. FACTS

Clark resides in Boone County, Iowa, and owns a farm there labeled by the USDA as Farm No. 4591, Tract No. 2332. Compl. ¶¶ 4, 15. On November 18, 2002, Clark requested that the United States Department of Agriculture Natural Re-

sources Conservation Service ("NRCS")[1] complete a Highly Erodible Land Conservation and Wetland Conservation Certification for an area of her farmland previously used for pasture. *See* Compl. ¶ 16; Admin. Rec. at 6, 26. Clark sought the certification to convert her pastureland into cropland.[2] *See* Admin. Rec. at 26. On or about December 2, 2002, Jared Finley ("Finley"), District Conservationist Field Officer of NRCS was scheduled to meet with Stephen Clark ("Mr.Clark"), Clark's son, at the farm to discuss "sodbusting and wetlands." *Id.* at 47, 404. Mr. Clark canceled the meeting. Finley, nonetheless, visited the Clark farm. *Id.* at 47. After a visual inspection, Finley noted potential areas of wetland. *Id.* However, because of the frozen conditions, Finley did not complete a Highly Erodible Land Conservation and Wetland Conservation Determination ("the Determination"). *Id.* Finley called Mr. Clark to inform him "not to do any bull-dozing or leveling [of] the oxbows[3] due to wetland issues." *Id.* On or about December 18, 2002, Finley received telephone calls stating that bull-dozing was taking place at the Clark farm. *Id.* Finley called Mr. Clark to reiterate his concerns over potential wetland issues. *See id.* Approximately three months later, on or about March 6, 2003, Jim Anderson, the tenant who farms the Clark farm, visited Finley to express concerns over "compliance issues on sodbusting [and] wetland." *Id.*

On April 11, 2003, Finley made a field visit to make the Determination on the specified pastureland. *Id.* After review of approximately thirty three acres, Finley determined that five acres, referred to as "the oxbows," were wetlands. *See id.* at 8–10. Under the National Food Security Act Manual (Third Edition) (the "NFSAM" or the "Manual"),[4] wetlands are identified by confirming the presence of the following three wetland criteria: (1) hydric soil; (2) hydrology; and (3) hydrophytic vegetation. *Id.* at 457, 462; *see* NFSAM § 513.11, *available at* www.nrcs. usda.gov/programs/compliance/pdf_files/ 3rdED-NFSAM_SEC513_v2006.pdf (hereinafter "NFSAM § "). Finley designated the oxbows into eight parcels of land and determined that each parcel met all three wetland criteria. *See* Admin. Admin. Rec. at 63–78. In a letter dated April 16, 2003, Finley informed Clark of the wetland determination and her appeal rights. *Id.* at 43–44. Specifically, the letter stated:

---

**1.** NRCS is "an agency within [the] USDA which is generally responsible for providing technical assistance in matter[s] of natural resources conservation and [is responsible] for administering certain conservation programs of [the] USDA." Admin. Rec. at 132. That is, "identifying wetland areas and for developing off-site and on-site wetland identification procedures in consultation with other Federal agencies that have wetland responsibilities." *Id.* at 300 (citing 7 C.F.R. § 12.30(a)).

**2.** To remain eligible for certain USDA program benefits, Clark was required to seek certification prior to cropping her pastureland. *See* Admin. Rec. at 6.

**3.** An oxbow is the land inside a U-shaped curve in a stream or bend in a river. The five acre land at issue will be referred to hereinafter as oxbows.

**4.** The NFSAM is a manual that specifically defines the technical application of the Swampbuster provision of the Food Security Act of 1985, as amended by the Food, Agriculture, Conservation and Trade Act. *See Barthel v. USDA,* 181 F.3d 934, 937 (8th Cir.1999). Thus, the purpose of the NFSAM "is to provide a definition of wetland, describe criteria and procedure for identifying wetlands, and explain agency coordination procedures which are necessary for making wetland determinations for the 1985 [Food Security] Act, as amended, and Section 404 of the Clean Water Act." NFSAM § 513.0.

"this preliminary technical determination will become final within 30 days [May 19, 2003] unless you request either [a field visit from NRCS to discuss the basis of the preliminary technical determination, answer any questions and gather additional information, or request a mediation to settle any concerns with the preliminary technical determination]." *Id.* The letter further stated that if neither option was requested and the preliminary technical determination became final, Clark could appeal the final technical determination to the Farm Service Agency (the "FSA"),[5] Boone County Committee, within thirty days. *Id.* at 44. Thus, Clark had the right to appeal the preliminary technical determination (five acres of wetland designation) to NRCS, then once the determination became final, appeal to the Farm Service Agency would be available. *See id.*

On May 7, 2003, Finley visited the Clarks to assess their bull-dozing activities. *Id.* at 47. At that time, only the fence lines on the farm were bull-dozed, and the bull-dozing did not affect the ox-bows. *Id.* Finley reiterated that the Clarks would have to get a permit to do anything to the oxbows. *Id.* The next day, on May 8, 2003, Finley received a "whistle blower" telephone call reporting that the Clarks were filling the oxbows. *Id.* Almost a year and a half later, on or about November 30, 2004, Finley again heard "[r]umors of [bull-]dozers moving in to fill

[the] oxbows" at the Clark farm. *Id.* On December 6, 2004, Finley received another "whistle blower" call about bull-dozers filling in the oxbows. *Id.* On December 8, 2004, Finley met with Mr. Clark at the farm to observe potential wetland violations. *Id.* at 48. Finley noted that two of the eight parcels of the wetlands were filled, and informed Mr. Clark that he was most likely "out of compliance." *Id.* In a letter dated December 10, 2004, Finley stated: "Your manipulation by filling in on this wetland area is considered an alteration that makes the area more farmable which is in violation of Swampbuster provisions [of the Food Security Act, as amended]." *Id.* at 34–35.[6] Finley informed Clark of her appeal rights, and concluded, "[y]ou will, in all likelihood, be determined to be ineligible for USDA benefits...." *Id.* at 35.

Clark appealed the NRCS determination.[7] On March 1, 2005, the Farm Service Agency denied Clark's appeal. *Id.* at 208–10. In the letter, the FSA stated:

[We] reviewed the information you submitted which consisted of the reasons you feel the areas that NRCS determined wetlands were in fact not natural wetlands at all. You stated 9 different reasons that you feel the violation was not serious and in fact these areas should not be determined wetlands.... After review of all of the information [we] determined that NRCS did com-

---

**5.** Responsibility for administering the Swampbuster provisions is divided between two USDA agencies, the NRCS and the FSA. NRCS makes, amongst other things, all the technical determinations, while the FSA makes determinations regarding ineligibility for benefits and exemptions. *Holly Hill Farm Corp. v. U.S.*, 447 F.3d 258, 263 (4th Cir.2006) (citing 16 U.S.C. § 3822(j); 7 C.F.R. §§ 12.6(c), 12.6(a), 12.6(b)(3)(viii)).

**6.** Under the Swampbuster, a provision of the Food Security Act, as amended by the Food,

Agriculture, Conservation and Trade Act, a person becomes ineligible for several farm-assistance programs if wetlands are converted for agricultural use. *See* 16 U.S.C. § 3821(a).

**7.** It is unclear from the record what NRCS determination Clark appealed at this time, the initial five acre wetland determination, the .9 acre conversion determination, or both. Based on the FSA's decision, however, it appears that Clark appealed both determinations. *See* Admin. Rec. at 208.

plete the wetland determination correctly.... NRCS documented how they arrived at the wetland determination through reviewing soil types and vegetation along with numerous other criteria that ultimately found the areas marked, to be determined wetlands according to their regulations.

*Id.* at 208–09. Clark was also informed of her right to appeal to the National Appeals Division.

## A. *Appeal to National Appeals Division Hearing Officer Holman*

In a letter dated March 21, 2005, Clark appealed the FSA's decision. *See id.* at 204. Clark stated that "the areas in question are not natural wetlands" and listed eight different reasons in support of that contention.[8] *Id.* at 204–05. On August 31, 2005, an appeal hearing was held before Hearing Officer Holman. *See id.* at 342–43. Mark Lindflott of NRCS represented the FSA during the hearing. *See id.* at 344 ("The agency, the decision-maker in this case is actually the Farm Service Agency that sent out the adverse notice as we reference it. However, the agency decision is based on a technical determination that was made by the Natural Resource Conservation Service and they are here representing Farm Service Agency today."). Prior to opening statements, Hearing Officer Holman sought clarification of the issue(s) on appeal. *See id.* at 352–53. Mr. Lawler, counsel for Clark, explained: "Appeal was taken from the [determination that 9/10 of the wetlands were converted] but my client's position is that in doing that appeal that they're entitled to appeal and review of all

the determinations made by NRCS." *Id.* In response, Mr. Lindflott stated: "[Mr. Lawler] did mention—thought they wanted to appeal them all, and I guess we got no problem discussing all the sites. That's fine." *Id.* at 354.

During the appeal, Clark argued that NRCS made errors in its wetland determinations. Specifically, Clark claimed: (1) NRCS should have obtained assistance from an experienced wetland delineator or soil scientist; (2) NRCS failed to intensively collect data to document its conclusions; (3) NRCS did not properly document the presence of hydrophytic vegetation; (4) NRCS did not refer to any recorded data concerning hydrology of the area; (5) NRCS made wetland vegetation determinations even in the absence of vegetation; (6) NRCS's use of watermarks as the sole indicator of wetland hydrology was incorrect; (7) NRCS failed to follow procedure to determine wetland hydrology; (8) NRCS failed to consider the functions and values of the wetlands or whether the manipulation only had a minimal effect on those functions and values; and (9) NRCS did not gather data as to whether the production of an agricultural commodity was possible in the oxbows before the filling of the .9 acre area. *See id.* at 282–85.

On October 25, 2005, Hearing Officer Holman upheld the FSA's determination. *See id.* at 215–18. Hearing Officer Holman explained that Clark did not meet her burden of proving that the FSA's determinations were erroneous. *Id.* at 217. Hearing Officer Holman rejected Clark's argument that "NRCS did not follow applicable regulations and did not follow wet-

---

8. Clark stated: (1) the oxbows never resembled wetlands to me; (2) I have been able to walk on the oxbows at any time; (3) the oxbows were seeded to grass and look identical to the rest of the pasture; (4) cows used the oxbows for grazing; (5) I never saw water standing in the oxbows; (6) the oxbows did not seem to have saturated soil conditions; (7) wildlife never use the oxbows; and (8) water from the stream (Squaw Creek) does not reach or flow through the oxbows. *See* Admin. Rec. at 204–05.

land identification and documentation procedures specified in the NFSAM and the COE Manual."[9] *Id.* Hearing Officer Holman reasoned that the regulation pertaining to NRCS's wetland determination responsibilities, 7 C.F.R. § 12.30, did not require NRCS to use specific forms or procedures from the NFSAM or the COE Manual. Indeed, Hearing Officer Holman was unable to find any references to the NFSAM or the COE Manual in the relevant regulation. *See id.* Moreover, Hearing Officer Holman agreed that Clark did not request a minimal effect determination before or after converting the wetlands. Thus, pursuant to regulation, it was Clark's burden of proof to establish minimal effect of the wetland conversion. *See id.* (citing 7 C.F.R. § 12.31(d)). Accordingly, Hearing Officer Holman concluded that the FSA "correctly determined that [Clark's] farm contains wetlands and converted wetlands." *Id.* at 218.

B. *Appeal to National Appeals Division Deputy Director Johnson*

On November 7, 2005, Clark requested a Director Review of Hearing Officer Holman's decision. *Id.* at 317–20. Specifically, Clark stated that the Hearing Officer incorrectly held that NRCS did not need to follow the NFSAM or the COE Manual, and that Clark had to apply for or request a minimal effect determination. *See id.* at 317–19. On December 29, 2005, Deputy Director Johnson upheld Hearing Officer Holman's decision. *See id.* at 299–304. In addressing the initial wetland determination, the Deputy Director stated that "[Clark] ha[d] provided insufficient evidence to conclude that the eight oxbows identified as wetland by NRCS [did] not meet all the regulatory criteria to be considered wetland, including wetland hydrol-

ogy, hydric soil and hydrophytic vegetation." *Id.* at 303. The Deputy Director concluded, the "bottom line here is that [Clark] has not shown that the study performed by NRCS was inaccurate in the conclusion that it reached." *Id.* As for the conversion issue, the Deputy Director noted that "the evidence is clear that [Clark] manipulated the wetland and therefore converted it." *Id.* Again, the Deputy Director stated that "[Clark] ha[d] failed to provide sufficient evidence to conclude that the two oxbows filled by her ... [did] not meet the criteria to be considered converted wetland." *Id.* Lastly, the Deputy Director explained that, under the applicable regulations, a request for a minimal effect determination is to be made prior to the conversion. *Id.* If the person converts a wetland and then seeks a minimal effect determination, the burden is on the person to demonstrate to the satisfaction of NRCS that the effect is minimal. *Id.* at 303–04 (citing 7 C.F.R. § 12.31(d)). The Deputy Director stated that "[Clark] has not produced any evidence of minimal effect[ ] because she [ ] insist[s] that NRCS should have made a determination in the first place." *Id.* at 304. The Deputy Director concluded "that [Clark] has not shown by a preponderance of evidence that FSA's decision to ratify the NRCS determinations of wetland and converted wetland were erroneous." *Id.* (citing 7 C.F.R. § 11.8(e)).

C. *Current Proceedings*

Clark filed a Complaint in this Court on September 29, 2006, seeking a declaratory judgment that "the Agency's action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; was in excess of statutory jurisdiction, authority, or limitations or short of

---

**9.** The Army Corp of Engineering Manual provides users with guidelines and methods to determine whether an area is a wetland for

purposes of Section 404 of the Clean Water Act.

statutory rights; was without observance of procedure required by law, and was unsupported by substantial evidence...." Compl. at 7. Moreover, Clark requests that the Court remand the matter with specific instructions directing the USDA to consider:

1. whether the area designated as a wetland is inundated for at least seven consecutive days during the growing season or saturated for at least fourteen consecutive days during the growing season using the NFSAM and COE procedures;

2. whether the hydrophytic vegetation which would have been supported in the area filled by the Plaintiff had it been left undisturbed be determined by comparison to the hydrophytic vegetation in the local area with the same soil map unit in a non-altered hydrological condition;

3. whether the oxbows could have been farmed prior to any filling and whether the filling of the oxbows was for the purpose of or had the effect of making them suitable for the production of an agricultural commodity;

4. whether the action of the Plaintiff individually and in connection with all other similar actions authorized by the Secretary [of the USDA] in the area had a minimal effect on the functional, hydrological and biological value of the wetlands in the area, including the value to water fowl and wildlife.

*Id.* at 7–8. The parties' arguments are discussed below.

## IV. STANDARD OF REVIEW

Judicial review of a National Appeals Division decision is authorized under 7 U.S.C. § 6999, which states: "A final determination of the Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of title 5...." A district court's review of an agency action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–06. *See generally Downer v. U.S.,* 97 F.3d 999, 1002 (8th Cir.1996). Under the APA, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court will "defer to an agency's interpretation of ... a statute if that interpretation is consistent with the plain meaning of the statute or is a permissible construction of an ambiguous statute." *Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks v. FERC,* 297 F.3d 771, 778 (8th Cir.2002) (citing *Escudero–Corona v. INS,* 244 F.3d 608, 613 (8th Cir.2001)); *see generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court also accords substantial deference to an agency's interpretation of its own regulations and will uphold that interpretation "unless it violates the Constitution or a federal statute, or unless the interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Coal. for Fair and Equitable Reg. of Docks on Lake of the Ozarks,* 297 F.3d at 778 (quoting *Univ. of Iowa Hosps. & Clinics v. Shalala,* 180 F.3d 943, 950–51 (8th Cir.1999)); *see also* 5 U.S.C. § 706(2)(B), (C). This deference is particularly appropriate when the agency determination at issue concerns a subject within the agency's own expertise. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Thus, the Court must defer to an agency's fact-based determinations in its own field of expertise, particularly where such determinations involve

scientific judgments, as agencies must be permitted "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S.Ct. 1851. This narrow review entails a "searching and careful" de novo review of the administrative record presented, to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Downer*, 97 F.3d at 1002 (quoting *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851).

## V. LAW AND ANALYSIS

### A. *Exhaustion of Administrative Remedies*

■ Clark states that, in addition to the wetland conversion issues, the Court should also consider whether the Agency erred when it determined that Clark's farm contained five acres of wetland. The Agency contends that Clark failed to exhaust her administrative remedies as to the initial wetland determination because she did not appeal that determination to the Agency within thirty days. Under the regulation, a wetland determination is certified as final thirty days after providing the person notice of certification or, if an appeal is filed, after the administrative appeal procedures are exhausted. *See* 7 C.F.R. § 12.30(c)(2). The Agency argues that, although the exhaustion requirement at issue is not jurisdictional, the Court should require Clark to exhaust such administrative remedies as a precondition to judicial review. *See Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 999–1000 (8th Cir.2006). Clark, on the other hand, argues that because the Agency agreed that the five acre wetland determination would be part of the .9 acre wetland conversion appeal, and because both the Hearing Officer and the Deputy

Director addressed the issue on appeal, the five acre wetland determination is properly before the Court. Clark further claims that, because the final Agency decision was premised on the initial wetland determination being reviewable, this Court should not now address the Agency's arguments to the contrary. Clark cites to *Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir.1990) for support, which states, "[i]t is a well-settled principle of administrative law that a reviewing court may not uphold an agency decision based on reasons not articulated by the agency itself in its decision."

Neither of the parties, however, address *B & D Land & Livestock Co. v. Veneman*, 332 F.Supp.2d 1200 (N.D.Iowa 2004). In *B & D*, the defendant, the Secretary of the USDA, similarly argued that a wetland determination by the Agency was "unreviewable" after the expiration of the thirty day appeal period. *See* 332 F.Supp.2d at 1210. That is, the plaintiff failed to exhaust its administrative remedies. *Id.* In that case, the plaintiff timely appealed the initial wetland determination, but then voluntarily withdrew the appeal before the Agency addressed the merits. *See id.* Approximately a year later, the Agency determined that the plaintiff had converted .9 acres of wetland. *Id.* at 1202. The plaintiff timely appealed the wetland conversion determination. During the final stage of the administrative appeal, the Acting Director rejected the plaintiff's contention that it had a right to a review of the initial wetland determination because B & D Land & Livestock Company had "waived the right for a review of the NRCS wetland determination" because it withdrew its timely appeal. *Id.* at 1204 (internal citation and quotations omitted). Thus, the merits of the initial wetland determination were not addressed substan-

tively during any of the agency proceedings.

The *B & D* court held that the Agency's action to bar the initial wetland determination from review was "inconsistent with the plain language of the statute." *See id.* at 1215. Specifically, § 3822(a)(3) and (4) provide:

(a) Delineation by the Secretary.

. . .

(3) Certification

On providing notice to affected persons, the Secretary shall—

(A) certify whether a map is sufficient for the purpose of making a determination of ineligibility for program benefits under section 3821 of this title; and

(B) provide an opportunity to appeal the certification prior to the certification becoming final.

(4) Duration of certification

A final certification made under paragraph (3) shall remain valid and in effect as long as the area is devoted to an agricultural use or until such time as the person affected by the certification requests review of the certification by the Secretary.

*Id.* at 1211 (quoting 16 U.S.C. § 3822). The B & D court explained that subsection (a)(3) of § 3822 "provides for an administrative appeal *prior* to final certification of a wetland." *Id.* at 1213 (citing *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (reliance first on the "plain language" of a statute is the "one, cardinal canon before all others")). Subsection (a)(4), in turn, "expressly provides for a *second administrative challenge* to a wetland determination, *after* the final certification of the wetland has become final, when a person affected by the certification requests review of the certification

by the Secretary." *Id.* Therefore, under the plain language of the statute, "a wetland determination that has become 'final' and 'certified' pursuant to § 3822(a)(3) is not 'unreviewable,' because § 3822(a)(4) expressly provides for a further administrative challenge to that wetland determination." *Id.* Thus, the *B & D* court reasoned that the plaintiff filed and withdrew its § 3822(a)(3) appeal, i.e., the appeal "prior to the certification [of the wetland determination] becoming final." *Id.* at 1215. However, the Agency was acting "inconsistent with the plain language of the statute" when it rejected the plaintiff's § 3822(a)(4) appeal. The *B & D* court remanded the wetland determination appeal issue because the Agency had not previously addressed the substance of that appeal.

Clark, like the plaintiff in *B & D*, did not file a § 3822(a)(3) appeal, i.e., an administrative appeal, prior to final certification of a wetland. But, like the plaintiff in *B & D*, Clark did file a § 3822(a)(4) appeal, i.e., an administrative appeal, after the final certification of the wetland became final. Although the parties may not have articulated the subsection under which the five acre wetland determination was being appealed, the parties were in full agreement that both the five acre wetland determination and the .9 acre wetland conversion issues were before the Hearing Officer on appeal. *See* Admin. Rec. at 353–54. Moreover, the Hearing Officer and the Deputy Director substantively addressed the merits of the five acre wetland determination issue in their orders. Thus, Clark properly appealed the initial wetland determination during the wetland conversion appeal. *See B & D Land & Livestock Co.,* 332 F.Supp.2d at 1215 ("[section] 3822(a)(4) expressly provides a producer a second bite at the apple to challenge the correctness of a wetland determination, *after that determination is 'final' and 'certi-*

*fied,'* when the producer is affected by that wetland determination, for example, by being charged with a wetland conversion violation"); *see also Branstad v. Veneman,* 212 F.Supp.2d 976 (N.D.Iowa 2002). Accordingly, because Clark has exhausted her administrative remedies, the issue of the initial five acre wetland determination is properly before the Court.

### B. *Definition of "Wetland"*

The "Swampbuster" Act provides that:

The term "wetland" ... means land that—

(A) has a predominance of hydric soils;

(B) is inundated or saturated by surface or groundwater at a frequency as duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and

(C) under normal circumstances does support a prevalence of such vegetation.

. . .

The term "hydric soil" means soil that, in its undrained condition, is saturated, flooded or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation. The term "hydrophytic vegetation" means a plant growing in—

(A) water; or

(B) a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.

16 U.S.C. § 3801(a)(18), (10), (11). It further states that the Secretary shall develop a list of such hydric soils and hydrophytic vegetation. *See* 16 U.S.C. § 3801(b)(2).

■ Clark contends that NRCS did not follow appropriate procedures when it determined in April of 2003 that Clark's farm contained five acres of wetland. Specifi-cally, Clark argues that NRCS did not adhere to the NFSAM or the COE Manual, both of which set forth the procedures for determination of wetland. *See* Pl.'s Br. at 21–28. Although the NFSAM is used for agricultural land while the COE Manual is used for non-agricultural land, the NFSAM provides that COE procedures be used to determine whether wetlands are present in "narrow bands" and "small pockets [of agricultural] land," such as the oxbows at issue. Def.'s Br. at 16; Admin. Rec. at 246 (NFSAM § 527.4). Thus, it is the Agency's position that under the NFSAM, the COE procedures were to be used in this case. In her post-appeal hearing brief submitted to the Hearing Officer, Clark identified numerous "inaccuracies" with the procedures utilized by NRCS to make the wetland determination. The Court will address each in turn.

### 1. *Hydric soil.*

■ First, Clark contends that NRCS erred in not seeking the assistance of a trained soil scientist during the wetland determination, as directed by the NFSAM. The Agency, however, points out that the NFSAM merely states that, "[w]hen soil conditions are difficult to interpret or seem inconsistent with the landscape, vegetation or hydrology it *may be necessary* to obtain the assistance of an experienced ... soil scientist." Admin. Rec. at 237 (quoting NFSAM § 527.4) (emphasis added in original). Thus, according to the Agency, "[n]ot seeking the aid of an experienced soil scientist is not a violation of established procedure since it only suggested that it MAY BE NECESSARY[,] not that it is required to obtain assistance or a second opinion." *Id.* Moreover, the type of soil obtained on Clark's oxbows, coland clay loam, is listed as a hydric soil in the Boone County Hydric Soils list. *Id.* at 369. Therefore, in this case, it was not

"difficult to interpret" the soil conditions present in the oxbows, and it was not necessary to obtain the assistance of an experienced soil scientist.

■ Clark also states that NRCS did not use proper forms to document soil data or "do intensive data collection." *Id.* at 282. The Agency contends that the NFSAM form is an "example form" and NRCS was not required to use that specific form exclusively. As for the "intensive data collection," the Agency states that the established procedure for wetland determinations in "small area[s]," only require that NRCS "sample a representative site and if [that site] is reflective of the site being examined as a whole, that is sufficient." That is, "it is normal procedure[ ]to only do one representative soil sample in ... small areas." *Id.* at 237. After careful review of the administrative record, the Court defers to the Agency's interpretation of its own procedures. As noted by the Agency, the NFSAM only suggests that NRCS seek the assistance of a soil scientist if soil conditions are difficult to interpret. Here, as demonstrated by the record, soil conditions in Clark's oxbows were not difficult to interpret. *Id.* at 63–78. Indeed, the soil identified by NRCS in Clark's oxbows were listed as hydric soil in the Boone County Hydric Soils list. *Id.* at 369. Furthermore, the Agency states that "intensive data collection" is not required for small areas. That is, established procedures indicate that NRCS may sample a representative site if the site is reflective of the site being examined as a whole. This is a reasonable interpretation of the Agency's procedures. *See Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks,* 297 F.3d at 778 (stating that courts should accord substantial deference to an agency's interpretation of its own regulations). Regardless of the extent of NRCS's "data collection," there is substantial evidence in the administrative record that the oxbows in Clark's farm met the hydric soil criteria.

### 2. *Hydrophytic vegetation.*

Second, Clark argues that NRCS failed to properly document the presence of hydrophytic vegetation. The Agency maintains that NRCS properly documented hydrophytic vegetation. Because the Agency used the COE Manual, it followed the 50:20 rule, a method used to determine the dominant vegetation on a site. Admin. Rec. at 368. The 50:20 rule requires NRCS to start by determining the relative "cover" of each plant species on the site. *Id.* Once that is determined, the field officer "start[s] with the most common species until [he or she can] account for at least 50 percent of the species that ... make up at least 50 percent of the ground covered." *Id.* Additionally, "if there's any species after that that makes up 20 percent of the cover, it's also included as a dominant plant species." *Id.* The vegetation found on the oxbows was listed in the National List of Plant Species that Occur in Wetland, and exceeded the 50 percent mark under the 50:20 rule for each site. *See id.* at 371–74. Thus, the mere fact that NRCS identified less than five species for each site does not affect the presence of hydrophytic vegetation under the 50:20 rule.

Clark, moreover, claims that NRCS did not follow the appropriate COE provision regarding absence of vegetation, even though it noted that vegetation was absent in some of the areas. *Id.* at 283. The Agency states that the provision identified by Clark is used only if the "area is presently *lacking* hydrophytic vegetation or hydrologic indicators due to annual or seasonal fluctuations in precipitation or ground water." *Id.* at 239. Although NRCS did note that there were "small

areas of bare soil due to inundation," vegetation was not lacking as there was adequate vegetation to "determine if the site had a hydrophytic vegetative community." *Id.* Therefore, the Agency contends that the COE provision identified by Clark is not relevant. The Court agrees.

As the administrative record indicates, the vegetation identified in Clark's oxbows were listed in the National List of Plant Species that Occur in Wetland. *See id.* at 371. NRCS, then, followed the 50:20 rule set forth in the COE Manual and identified the "coverage" of each plant species. *See Id.* at 63–78. The record demonstrates that the vegetation in each site exceeded the 50 percent mark under the 50:20 rule. *Id.* at 371–74. As for Clark's contention that the Agency failed to follow proper procedures regarding how to proceed in the absence of vegetation, the record illustrates that such procedures would not apply to Clark's oxbows. The applicable COE Manual provision limits its application to areas "lacking hydrophytic vegetation or hydrologic indicators." However, as noted above, the oxbows had sufficient vegetation for NRCS to follow the 50:20 rule. Accordingly, there is substantial evidence in the administrative record that the oxbows in Clark's farm met the hydric vegetation criteria.

3. *Hydrology.*

Third, Clark identifies numerous problems with the determination of wetland hydrology. Clark states that NRCS determined wetland hydrology based on watermarks. However, according to Clark, the COE Manual defines watermark as a mark on "woody vegetation," and because all of the site composing the oxbows did not contain any woody vegetation, it was impossible for NRCS to find "watermarks." The COE Manual, however, defines watermark as "stains on bark or other fixed objects...." *Id.* at 240. The Agency notes that, although woody vegetation is the most common object to find watermarks, other fixed objects can and may be used. *Id.* In this case, NRCS was able to observe watermarks on "other perennial vegetation such as reed canarygrass growing in the wetland sites...." *Id.* Thus, woody vegetation is not required to find watermarks.

Next, Clark contends that the "watermarks" only reflect recent inundation, not the duration of the inundation. *Id.* at 283–84. As such, the watermarks cannot be the sole data relied upon to indicate wetland hydrology. *Id.* at 284. The Agency, however, states that a primary indicator, or any two secondary indicators, must be present to conclude that wetland hydrology is present. *See id.* at 241. Under the applicable procedures, "primary indicator[s] are visual observation of inundation or soil saturation, *watermarks,* drift lines, sediment deposits, and drainage patterns in wetlands." *Id.* at 240 (emphasis added). Here, in addition to the primary indicator (watermark) on each of the eight sites, NRCS observed and noted two secondary indicators.[10] Hence, each site contained both a primary indicator and two secondary indicators. Thus, even though Clark may disagree as to what the watermarks actually indicate, the dispute is in the realm of agency expertise, and not the result of arbitrary and capricious decision-making. *Downer,* 97 F.3d at 1004.

Clark next claims that NRCS failed to refer to any recorded data concerning the

---

10. "Secondary indicators are: presence of oxidized rhizospheres associated with a living plant roots in the upper [twelve] inches of the soil, presence of water stained leaves, local soil survey data hydrology data for identified soils, and the FAC neutral test." Admin. Rec. at 241 (citing HQUSACE, 6 Mar 92).

hydrology of the area. Under the COE Manual, recorded data for areas adjacent to streams are "very useful," as it provides "short and long term information about the frequency and duration of inundation." Admin. Rec. at 283. Clark argues that, because the oxbows are adjacent to a stream (Squaw Creek), NRCS should have referred to available recorded data pertaining to the stream. In response, the Agency explains that though recorded data may be useful, under the COE procedures, the dispositive criteria are positive indicators of hydrology (a primary or two secondary indicators). *Id.* at 239. The Agency notes that any recorded data is *a* factor in making the hydrology determination, but does not override the procedural requirement. Moreover, the Agency states that there is no "recorded data on stream flows in the area of the Clark property." *Id.*

Lastly, Clark claims that NRCS failed to follow the NFSAM procedure to determine wetland hydrology and failed to follow the COE Manual to determine saturation. Clark contends that, under the COE procedure, NRCS should have dug a pit at least sixteen inches deep and allowed sufficient time to lapse to determine the depth of water collected in the pit. *Id.* at 284. NRCS, however, made a "pit" with a soil probe, approximately two inches in diameter, and used a tape measure to measure the depth of the water. *Id.* The Agency states that under the NFSAM, the oxbows at issue fall under the category of "Narrow Bands and Small Pockets in Ag [L]and," such that the COE Manual, not the NFSAM, was used to determine wetland hydrology. As discussed above, under the COE Manual, wetland hydrology is present if one primary or two secondary indicators are present. Therefore, because all eight sites comprising the oxbows contained both a primary indicator and two secondary indicators, wetland hydrology

was present. The Agency also explains that saturation (depth of water collected) is not relevant, as saturation is not required to meet the wetland hydrology criteria. As an aside, the Agency opines that the method used by NRCS to dig the two inch diameter "pit" was "probably a more conservative method" than the COE procedure of digging a one foot diameter pit and waiting for water to pond the hole. *Id.* at 242.

In *Chevron,* the Supreme Court made clear that an agency has broad discretion in its interpretation of a statute, stating: "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations. . . ." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. The Court must "defer to an agency's interpretation of . . . a statute if that interpretation is consistent with the plain meaning of the statute or is a permissible construction of an ambiguous statute." *Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks,* 297 F.3d at 778 (citing *Escudero–Corona,* 244 F.3d at 613); *see generally Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. Here, Clark contends that the Agency's wetland determination is not supported by substantial evidence because the determination is based on evidence not gathered, improperly gathered, or inadequately documented. However, as discussed above, NRCS followed the applicable procedures, and there was substantial evidence before the Agency that the oxbows in Clark's farm met the hydric soil, hydrophytic vegetation, and hydrology criteria. Indeed, the Hearing Officer "found that the designated area contained hydric soil, exhibited a prevalence of hydrophytic vegetation, and contained sufficient primary and secondary wetland hydrology indicators to

meet the wetland hydrology criteria set forth in the COE 1987 Wetland Delineation Manual." Admin. Rec. at 302. Additionally, "[a]erial photography of the subject wetland acreage covering years 1985 through 1988, as well as 1990 and 2004, showed the eight parcels continually exhibited wetland indicators in spite of [Clark's] verbal claims to the contrary." Admin. Rec. at 302. Therefore, there was substantial evidence to determine that the five acres of land at issue were wetlands. Accordingly, the Agency's action was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" when it concluded that Clark's farm contained five acres of wetland.

C. *Definition of "Converted Wetland"*

■ Clark argues that the Agency erroneously failed to consider whether production was possible before the filling of the .9 acres in violation of the statute. The authorizing statute defines converted wetland as follows:

> The term "converted wetland" means wetland that has been drained, dredged, *filled,* leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity[11] possible if—(i) *such production would not have been possible but for such action....*

16 U.S.C. § 3801(a)(6)(A) (emphasis added). The federal regulation defines converted wetland as follows:

> Converted wetland is a wetland that has been drained, dredged, *filled,* leveled, or

otherwise manipulated (including the removal of woody vegetation or any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity without further application of the manipulations described herein if: (i) *Such production would not have been possible but for such action....*

7 C.F.R. § 12.2(a) (emphasis added). Clark contends that the statute and the regulation require the Agency to first determine if production of an agricultural commodity was possible in the oxbows before the filling, then determine if production of an agricultural commodity was possible after the filling. *See* Pl.'s Br. at 31 ("there is evidence ... that production of agricultural commodity did occur before the filling and leveling. There is no evidence concerning agricultural production after the filling and leveling."). In essence, Clark argues that, to make a converted wetland determination, NRCS must first determine that agricultural commodities *could not* be planted, as opposed to finding that agricultural commodities *were not* planted in the oxbows.[12]

■ Despite Clark's claims to the contrary, a wetland is converted so long as "production of an agricultural commodity is possible, even if an agricultural commodity has not actually been produced." *Holly Hill Farm Corp. v. U.S.,* 447 F.3d 258, 263 (4th Cir.2006) (citing 16 U.S.C. § 3821(c); 7 C.F.R. § 12.4(a)(3)). Thus, the lack of evidence regarding "agricultural production after the filling and leveling"

---

11. "Agricultural commodity" means "any agricultural commodity planted and produced in a State by annual tilling of the soil, including tilling by one-trip planters...." 16 U.S.C. § 3801(a)(1).

12. The Court notes that as a practical matter, it would be difficult to imagine a scenario in which NRCS would be able to determine *after the fact* that it was impossible to produce agricultural commodities in a wetland prior to its conversion.

is not relevant to the converted wetland determination. Moreover, Clark focuses on the fact that NRCS presumed that production of an agricultural commodity was not possible in the area prior to its conversion, when in fact, according to Clark, there was testimony to the contrary. During the appeal hearing before Hearing Officer Holman, Mr. Lawler asked Finley:

> Now, what [the statute and regulation] says to me is if the production of an agricultural commodity was possible before the conversion, then the conversion didn't make that agricultural production possible. It was already possible. It may have made it more profitable. It may have made it easier but did it make it possible? ... And we have nothing here that shows and there was no investigation made by the agency ... about what the possibility was of an agricultural commodity either before or after.

*Id.* at 431–32. Finley replied: "The only evidence I can show is that during certification of agriculture commodity that piece has never been farmed and they did try to farm it. Prior to converting it actually[,] the operator did drive through there and try to plant agriculture commodity. What he produced I cannot answer that." *Id.* at 432. However, under the applicable statute and regulation, Clark's *attempt* to plant agricultural commodity prior to the filling does not somehow render the wetlands exempt from conversion.

■ Following Clark's logic, any wetland that may possibly sustain and produce an agricultural commodity could never be a converted wetland despite manipulations to the wetland because the production of agricultural commodity was possible prior to the manipulation. In essence, Clark would have the Court categorically exempt "farmable" wetlands from the Swampbuster provisions of the Food Security Act, as amended by the Food, Agriculture, Conservation and Trade Act. The purpose of the Act is, however, to protect and preserve wetlands. *Gunn v. USDA*, 118 F.3d 1233, 1235 (8th Cir.1997) ("In order to combat the disappearance of wetlands through their conversion into crop lands, Congress passed a law known commonly as 'Swampbuster.' "). The Act does not limit its protection to wetlands that cannot be farmed. Indeed, it is the farmable wetlands that need more protection than those wetlands that cannot be farmed.

Furthermore, under the NFSAM, the term "making production possible" means manipulation:

1. which allows or would allow production of an agricultural commodity where such production was not previously possible, or

2. making an area farmable more years than previously possible, or

3. which reduces crop stress and allows increased crop yields, or

4. after November 28, 1990 that allows forage production or pasture and hayland use. On sites with woody vegetation, trees and stumps must be removed to constitute "making production possible."

Admin. Rec. at 268 (NFSAM § 514.20). Thus, even assuming that Clark produced an agricultural commodity prior to the filling of the oxbows, Clark's actions would still fall under the second definition, making the area *more* farmable than in previous years. The Agency, however, relied upon aerial photographs which showed that the oxbows at issue were not cropped prior to the filling. *See id.* at 243 ("These wetlands are in [ ] pasture areas that [were] not being farmed. See the FSA aerial photos from 1985 and on. ... The tenant farmed the field in which the oxbows are present in 2004 but did not crop

the oxbow wetland areas prior to filling and has not cropped the six wetlands that were not filled.").

As for Clark's purpose in filling the oxbows, the NFSAM defines the term "for the purpose of" as:

> Actions completed that show an intent to make production possible. Such actions need not actually make agriculture production possible. Actions discovered in progress which *show an intent to,* or if completed, would make possible the production of an agricultural commodity area is also considered a conversion. Examples: Partial removal of woody vegetation (stems and stumps) from forested wetlands, partially draining herbaceous wetlands, *or placing fill in a wetland.*

*Id.* at 268 (emphasis added).

Because there is no dispute that Clark filled the oxbows, the issue turns on Clark's intent. The Agency contends that Clark filled the oxbows with an intent to produce agricultural commodities. In support, the Agency relies on Clark's November 2002 Highly Erodible Land Conservation and Wetland Conservation Certification request form. The certification form asks, "During the crop year entered ... above [2003], or the term of a requested USDA loan, did or will you plant or produce an agricultural commodity on land for which a highly erodible determination has not been made?" Clark checked "Yes." *Id.* at 6. Furthermore, in a letter dated January 1, 2005, to the Army Corp of Engineers, signed by both Clark and Mr. Clark, Mr. Clark summarized the events leading up to the wetland conversion determination by NRCS. *Id.* at 25–33. In the letter, Mr. Clark explained that, "[t]o increase mom's income, [Dan] Brutsche [an Iowa State University farm field consultant], suggested converting her pasture to cropland.

Mom thought that was a great idea so, in the winter of 2002, we hired Brian Jensen (of Jensen Excavating in Nevada, Iowa) to start removing brush, trees and fences." *Id.* at 26. Based on the record, it was reasonable for the Agency to determine that Clark filled the .9 acres for the purpose of "converting her pasture to cropland." Accordingly, the Agency's action was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" when it concluded that Clark converted .9 acres of wetland.

D. *The Minimal Effect Exemption*

Under the Act, any person who converts a wetland is ineligible for certain federal loans and payments. *See* 16 U.S.C. § 3821(c). However, the "minimal effect[ ] exemption provides that a producer may manipulate a wetland if the changes will have only a 'minimal effect on the functional hydrological and biological value of the wetland in the area.'" *Holly Hill Farm Corp.,* 447 F.3d at 266 (quoting 16 U.S.C. § 3822(f)). The statute states:

> The Secretary shall exempt a person from the ineligibility provisions ... for any action associated with the ... conversion of a wetland, if ... [t]he action, individually and in connection with all other similar actions authorized by the Secretary in the area, will have a minimal effect on the functional hydrological and biological value of the wetlands in the area, including the value to waterfowl and wildlife.

16 U.S.C. § 3822(f). According to Clark, the term "shall" in effect mandates the USDA "to determine if the results of the activity are only minimal, and if yes[,] to exempt a person from ineligibility for benefits." Pl.'s Br. at 33. Essentially, Clark argues that the burden is always on the Agency to initially make a minimal effect determination when a wetland is convert-

ed. The regulation, however, clarifies that:

> NRCS shall determine whether the effect of any action of a person associated with the conversion of a wetland ... has a minimal effect on the functions and values of wetlands in the area. Such determination shall be based upon a *functional assessment of functions and values of wetland under consideration and other related wetlands in the area,* and will be made through an on-site evaluation. *A request for such determination will be made prior to the beginning of activities that would convert the wetland.* If a person has converted a wetland and then seeks a determination that the effect of such conversion on wetland was minimal, *the burden will be upon the person* to demonstrate to the satisfaction of NRCS that the effect was minimal.

7 C.F.R. § 12.31(d) (emphasis added). Further, the NFSAM provides:

> A minimal effect evaluation worksheet ... will be completed for each non-categorical minimal effect request.
>
> . . .
>
> [For pre-conversion minimal effect exemptions], [t]he NRCS ... will visit the site to conduct and document an on-site evaluation using the *appropriate functional assessment* worksheet for all pre-conversion minimal effect requests *unless the request falls within an approved categorical minimal effect.*
>
> . . .
>
> Persons who request post-conversion minimal effect determinations are required to provide satisfactory evidence to *NRCS* to demonstrate that the conversion effects were minimal, *and that no existing easement provisions have been violated.*

NFSAM §§ 516.12, 516.21–.22.

■ Clark contends that the regulations are inconsistent with the statute. Clark reiterates that the term "*shall*" places the burden on the Agency to determine minimal effect, not Clark. *See* 16 U.S.C. § 3822(f) ("The Secretary *shall* exempt a person from the ineligibility provisions. . . ."). However, as previously noted by this Court, "the statute is silent on the question of who should bear the burden of proof regarding the question of minimal impact, and the Court can see no clear conflict between the statute and the regulation." *Ballanger v. Johanns*, 451 F.Supp.2d 1061, 1070 n. 4 (S.D.Iowa 2006). The regulation makes clear that it is Clark's burden to initially request a minimal effect determination prior to the conversion. *See* 7 C.F.R. § 12.31(d). Clark argues that *Barthel v. USDA*, 181 F.3d 934, 938 (8th Cir.1999) (Beam, J.) adopted the dissenting opinion of *Downer v. U.S.*, 97 F.3d 999, 1009 (8th Cir.1996) (Beam, J., concurring in part and dissenting in part), to establish that the "law in the [Eighth] Circuit is that USDA has the burden to prove that Mrs. Clark is ineligible for benefits." Pl.'s Reply Br. at 7. The Court disagrees. In *Downer*, Judge Beam explained that it was the Agency's initial burden to determine that the land at issue "is within the purview of the Swampbuster legislation." 97 F.3d at 1010. Thus, if the "initial determination" establishes that the land was indeed a wetland or converted wetland within the scope of the Swampbuster legislation, "then the burden of establishing an exemption falls upon the producer shown to be ineligible." *Id.* Despite Clark's claims to the contrary, Judge Beam's opinion does not suggest that "the [A]gency must first determine if the conversion is eligible to be considered for an exemption." Pl.'s Reply Br. at 7. Therefore, although it may be the Agency's burden to determine ineligibility for the exemption, it is so only *after* Clark makes a

request for such a determination in the first instance. Where, as here, the minimal effect determination is sought after the wetland has been converted, the regulation shifts the ultimate burden to Clark. The regulation provides that "[i]f a person has converted a wetland and then seeks a [minimal effect] determination ... the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal." *See* 7 C.F.R. § 12.31(d). The regulation, then, provides an incentive for farmers to seek a minimal effect determination before the farmer manipulates a wetland. This incentive scheme is consistent with the purpose of the Act, and the Agency's interpretation of the statute is reasonable under *Chevron. See Holly Hill Farm Corp.*, 447 F.3d at 268; *Durbin v. Farm Serv. Agency*, No. 05-cv-566, 2007 U.S. Dist. LEXIS 28720, at *21–27 (S.D.Ohio Apr. 13, 2007) (providing an explanation of *Holly Hill Farm Corp.*). Here, except for Clark's argument that the Agency should have made a minimal effect determination on its own initiative when it first determined that Clark converted .9 acres of her wetlands, Clark offers no evidence to establish that the effect of her conversion was, indeed, minimal. Accordingly, the Agency's action was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" when it concluded that Clark did not meet her burden of proof regarding minimal effect.

## VI. CONCLUSION

For the reasons discussed above, the Agency's decision is AFFIRMED.

IT IS SO ORDERED.